UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| CORNERSTONE SQUARE | ) | |
|---|---|---|
| ASSOCIATES, LTD. | ) | |
| | ) | |
| V. | ) | NO. 2:07-CV-150 |
| | ) | |
| BI-LO, LLC, *ET AL.* | ) | |

## MEMORANDUM OPINION

Cornerstone Square Associates, LTD ("plaintiff") and Bi-Lo, LLC ("defendant") were landlord and tenant respectively under a lease agreement executed in 1984 between the parties' predecessors-in-interest.

Plaintiff owns a strip shopping center in Morristown, Tennessee. The shopping center is one large building that is divided into numerous separate spaces of varying sizes. The largest space in the shopping center, by far, is the space that was leased to the defendant in which it operated a grocery store; that space accounted for 71.15 percent of the total square footage of the entire shopping center.

The term of the lease was twenty years, and the parties agree that the lease between plaintiff and defendant was to expire on November 17, 2005.

Defendant was to pay monthly rental of $17,482.50. Additionally, defendant was required to pay to the plaintiff a prorated portion of the taxes, insurance premiums, and "common area maintenance" expenses attributable to the entire shopping center. Specifically, defendant's responsibility for taxes, insurance, and common area maintenance

expenses was "based on the ratio the square footage of [defendant's leased area] bears to the square footage of all leasable space in the Center."[1] Since defendant leased 71.15 percent of the total leasable square footage in the shopping center, it was obligated to pay 71.15 percent of the total insurance premiums, taxes, and expenses attributable to maintenance of the common areas.

It is the common area maintenance ("CAM") expenses that precipitated this litigation. The relevant section of the lease is ¶ 27:

> COMMON AREA CHARGES   27. Landlord will keep all parking areas and other common areas on the Shopping Center property orderly and clear and free of dirt, debris or snow, in a good state of repair, including resurfacing of the parking lot, if necessary, and will provide adequate lighting and drainage of the same, and will keep parking lot striping in presentable and readily visible appearance. Red Food agrees to pay its proportionate share of such common area maintenance expenses during the term of this Lease and any renewals thereof in equal monthly installments with rental herein, which shall be one-twelfth (l/12) of the Landlord's estimate of such expenses.  At the end of each lease year, Landlord shall provide Red Food with a written statement and proof in sufficient detail, including but not limited to, invoices and receipted bills, of such common area expense. If Red Food has underpaid said expenses, Red Food shall promptly pay Landlord the difference, and if Red Food has overpaid said expenses, such overpayment shall be credited against its obligation in the immediately following month, except that Landlord shall remit promptly to Red Food such overpayment applicable due to expiration or termination of the Lease.
> 
>  Red Food's proportionate share of such common area maintenance expenses shall be the same fraction of the common area maintenance expenses as the ratio of Red Food's square footage in the Leased Premises bears to the total square footage of all leasable space in the Center.  The term common area maintenance expenses shall include, without limitations, expenses related to the operating, managing, equipping, lighting, repairing, replacing, and maintaining

---

[1] Lease Agreement, ¶¶ 13, 14, and 27.

> of the common areas in the Shopping Center, specifically including landscaping and gardening, the maintenance, repairing and replacing of the parking lot, the cost of liability insurance for the common areas in the Shopping Center, line painting, lighting, traffic control, if any, sanitary control, removal of snow, trash, rubbish and garbage, and the cost of personnel to implement such services.

Plaintiff owns other properties and shopping centers around the country, and it retained the services of a property management company, SunVista Corporation, to oversee and manage those properties. SunVista's representative was Ms. Deborah Gulledge, the daughter-in-law of Keith Gulledge, who is the Chief Executive Officer of the plaintiff-landlord. Further, Keith Gulledge was also CEO of SunVista to insure that he had the last word on any decisions made by SunVista regarding plaintiff's properties which were managed by SunVista.

As noted, defendant's tenancy was to expire on November 17, 2005. In July 2005, Ms. Gulledge visited the shopping center and noted that the parking lot was in deplorable condition; the asphalt pavement was cracked and broken in many places, and there were a number of significant potholes. Although the parking lot had been patched at various times during the twenty years the shopping center had been in existence, it had never been completely repaved.

Deborah Gulledge instructed plaintiff's local maintenance supervisor, David Vaughn, to solicit bids for the repaving of the entire parking lot. John Hale Paving Company of Morristown ("Hale") submitted a bid in the amount of $120,145.00. Deborah Gulledge submitted that bid to Keith Gulledge, requesting authorization to accept Hale's bid and

proceed with the repaving. Because of personal distractions and inattention, Keith Gulledge allowed his daughter-in-law's recommendation to languish on his desk for several months. Indeed, he allowed it to lay there until November 2005, the month in which defendant's lease was to end. Of course, defendant was far and away the largest tenant in the shopping center and thus had the proportionately largest responsibility for payment of common area maintenance expenses. If defendant became unavailable to pay its prorated share of the costs of repaving, the plaintiff-landlord would have had to pay that share. Thus, time was critical from Deborah Gulledge's standpoint. The evidence is clear that Ms. Gulledge was desperate to repave the parking lot before defendant's lease expired so that plaintiff could "stick" defendant with a portion of the cost.[2] Having become aware of the extreme urgency of the situation, Mr. Gulledge communicated to Deborah Gulledge his approval of Hale's bid. That bid was accepted on November 11, 2005, six days before defendant's lease was to expire; Hale started work on that same day. The actual repaving was not completed until December 1, 2005. Due to cold weather, the striping (painting) of the parking lot was not accomplished until sometime in January 2006.

On January 20, 2006, plaintiff demanded that defendant remit $89,012.00, which represented 71.15 percent of the total cost of repaving.[3] This was the first knowledge defendant had of the repaving. Defendant refused to pay on the basis that those expenses

---

[2]*See*, e.g., Ex. 17.

[3]The total CAM expenses requested by plaintiff was $140,815.44, an amount which included expenses in addition to the cost of repaving; those other CAM charges were paid and are irrelevant to this suit.

4

were incurred after the lease terminated on November 17, 2005.[4]

Although there was testimony presented that as late as November 14, 2005, there was no indication that any work had commenced on the parking lot, the court credits John Hale's testimony that his company commenced work on November 11, 2005, based upon verbal instructions he received from someone (probably Mr. Vaughn, the local maintenance supervisor). Similarly, the court credits Mr. Hale's testimony that he received the formal written acceptance of his July bid on that same day, November 11, 2005. Further, based on Mr. Hale's testimony, the court finds that the repaving work itself was completed on December 1, 2005, and that the painting or striping work was delayed until January as a result of intervening cold weather.

The first issue that must be resolved is whether a repaving of the parking lot is a CAM expense under ¶ 27 of the lease. That paragraph undeniably contemplates that a repaving or resurfacing of the parking lot would be a CAM expense:

> Landlord will keep all parking areas . . . in a good state of repair, including resurfacing of the parking lot, if necessary, . . . .
>
> * * *
>
> The term common area maintenance expenses shall include, without limitations, expenses related to the . . . replacing, and maintaining of the common areas in the Shopping Center, specifically including . . . repairing and replacing of the parking lot . . . .

Whether repairing the parking lot is a "capital expenditure" or not is irrelevant inasmuch as the lease explicitly refers to *replacing* the lot. Defendant's argument that it has

---

[4]Ex. 8.

5

no responsibility for its share of the repaving costs because the work was not completed within the term of the lease is rejected. Paragraph 27 obligates the defendant to pay its prorated share of common area maintenance expenses; there is no requirement that the work for which a CAM expense is incurred be completed within the term of the defendant's tenancy. Defendant points out that a contract for snow removal entered into during the term of the lease, which was to be performed *after* the lease expired, would not be a CAM expense for which a tenant would be liable, and the court agrees. However, in the example of a contract for snow removal that is to be performed after the lease ends, the tenant never would have received any benefit from it. In the case of resurfacing the parking lot, however, the defendant had received the benefit of that parking lot for twenty years; better stated, defendant had contributed to the deterioration of that parking lot by doing business in the shopping center for those twenty years.

Therefore, the cost of resurfacing of the parking lot was *incurred* as of November 11, 2005, the date plaintiff accepted Hale's proposal and therefore was a CAM expense. The fact that the repaving was not completed until after the termination of the lease is of no legal significance; as of November 17, 2005, plaintiff became legally obligated to Hale for $120,145.00, and Hale was legally obligated to repave the lot.

Defendant insists that ¶ 27 required the plaintiff to provide an *estimate* of CAM expenses to the tenant, and that in the succeeding year the tenant would pay twelve equal monthly installments of that estimated amount, with a year-end adjustment for over or under payments. Since plaintiff provided a bill for charges already incurred, as opposed to an

estimate of expenses to be incurred, defendant argues that there has been a violation of ¶ 27 which relieves it of responsibility.

Even if a failure to procure an estimate and submit same to the defendant was a breach of ¶ 27 (which is doubtful), it was not a material breach that would excuse defendant's duty to pay that CAM expense. There is nothing within ¶ 27 that gives the tenant the right to contest a CAM expense, apart from simply refusing to pay it on the basis that it was unreasonable and allowing a court to ultimately decide the issue. The only legitimate argument defendant has in this regard is that it would have had the right to amortize the CAM expense over a twelve-month period. And, to be sure, that right did not evaporate with the termination of the lease. All other issues aside, defendant legitimately could have insisted on paying its pro rata share of the costs of repaving in twelve equal payments. However, defendant no longer has a legitimate complaint in that regard since it now has had nearly eighteen months longer than it would have had initially, and it has paid nothing.

Defendant next points out that under Tennessee law there is within every contract an implied covenant of "good faith and fair dealing," and that plaintiff breached that covenant. In this regard, defendant vigorously argues that a "midnight hour" repaving of the parking lot was patently unfair. As previously noted, plaintiff hurriedly let the contract for the repaving job to insure, to the extent it could, that the repaving would be a CAM expense for which defendant would have responsibility. Somewhat in the same vein, defendant argues that plaintiff not only withheld from defendant its intention to repave the lot, it also withheld from defendant the fact that the parking lot had been repaved until January 20, 2006, two

7

months after the lease expired. Defendant asserts that the timing of the repaving violated the implied covenant which should excuse defendant's obligation to pay for it.

Neither the timing of the repaving nor plaintiff's motivation constitutes a breach of the implied covenant of good faith and fair dealing:

> Under Tennessee Law, every contract carries with it an implied covenant of good faith and fair dealing. As a result of this covenant, each contracting party promises to perform its part of the contract in good faith and, in return, expects the other party to do the same. The purpose of the implied-in-law covenant is two-fold. First, it honors the contracting parties' reasonable expectations. Second, it protects the rights of the parties to receive the benefits of the agreement they entered into. **The implied obligation of good faith and fair dealing does not, however, create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.**

*Goot, et al., v. Metropolitan Government of Nashville and Davidson County*, 2005 WL 3031638 [internal citations and footnotes omitted]; [emphasis supplied].

As discussed in the initial portion of this opinion, so long as plaintiff incurred, within the term of defendant's lease, the contractual obligation for the repaving of the parking lot, that repaving was a CAM expense under ¶ 27 of the lease. It follows that the fact that plaintiff let the repaving contract a mere six days before the termination of the lease cannot be a violation of the implied covenant of good faith and fair dealing; to hold that it was a violation of the implied covenant would be tantamount to re-writing ¶ 27, which the court cannot do.

Neither is plaintiff's secrecy concerning the repaving project a violation of the implied covenant. For reasons not at all understood, no representative of plaintiff or SunVista ever

told defendant that the parking lot was going to be repaved. In fact, it appears that the various representatives of plaintiff and its property management company intentionally withheld that information from defendant. It bears noting that defendant itself did not occupy the leased premises; it sublet the premises to another business in 1995. Thus, unless someone told a representative of defendant that the lot was going to be repaved, or was in the process of being repaved, defendant would have no way to know of it. Deborah Gulledge freely admitted that she never told any representative of defendant that the lot was going to be repaved. Her explanation for not telling defendant of the repaving was that the lease did not obligate her to do so. Insofar as it goes, that is a correct statement. However, her secrecy was rather foolish, completely unnecessary, and essentially guaranteed this lawsuit. But, foolish or not, Ms. Gulledge's failure to apprise defendant of plaintiff's intent to repave the lot, or to tell defendant that the lot was in the process of being repaved, was not a violation of the implied covenant of good faith and fair dealing. As acknowledged by defendant's witness, Colleen Johnson, if plaintiff had advised defendant in early 2005 that it intended to repave the lot, defendant would have paid its pro rata share of the cost without objection. Defendant suffered no real prejudice as a result of its lack of knowledge of the repaving.[5]

Defendant next argues that there was an accord and satisfaction between the parties which precludes recovery by plaintiff of any expenses related to the repaving of the parking

---

[5]Defendant did not plead estoppel, so that is not a potential defense to this suit. Even if pleaded, defendant suffered no prejudice as a result of its lack of knowledge of the repaving, i.e., it took no action to its detriment based on its lack of knowledge.

lot. There are additional facts which are pertinent to this facet of the case which must be considered :

Preliminarily, it is recalled that as early as July 2005, Ms. Gulledge and Mr. Vaughn made the decision to recommend to the landlord that the entire parking lot be repaved. It is further recalled that the landlord's CEO, Mr. Keith Gulledge, neglected to authorize the repaving, as a result of which the termination date of defendant's lease was fast approaching. Since plaintiff wanted to pass on 71.15 percent of the cost of that repaving to defendant, and since defendant's lease was to terminate on November 17, 2005, plaintiff accepted Hale's bid on November 11, 2005, and instructed him to start work the same day.

On November 14, 2005, Paul Holder, on behalf of defendant, visited the site to perform a walk-through of the leased premises in preparation of "clearing the books." Mr. Holder testified that he saw no evidence that the parking lot was being repaved. To the extent that the court is asked to infer from his testimony that no repaving work had commenced by that date, his testimony conflicts directly with that of John Hale. The court previously has credited the testimony of Mr. Hale, and the court reaffirms that finding; work on the parking lot had started on November 11, 2005. However, for the sake of the discussion that follows hereafter, the court will assume that Mr. Holder did not *notice* any repaving of the parking lot.

Mr. Holder was charged with the responsibility of winding up defendant's relationship with the plaintiff under the parties' lease. When defendant itself moved out of the leased premises in 1995 and sublet it to others, the premises was divided into two spaces. Under

the lease agreement, defendant was obligated to remove the partition wall, as well as to make various other repairs necessitated by defendant's or its sub-tenants' occupancy. Mr. Holder's observations resulted in a series of e-mail correspondence between Mr. Holder and (primarily) Deborah Gulledge.[6] That e-mail correspondence is paraphrased as follows:

(1) On November 29, 2005, Mr. Holder e-mailed Ms. Gulledge that defendant, contrary to a preceding letter from Ms. Gulledge, had paid a full month's rent for November, rather than a prorated amount. He also told her that he wanted to review all bids for removal of the wall before that work was started. He also stated that from his perspective, defendant was not obligated for any debris removal since the area already was "broom clean" as required by the lease.

It is obvious from Holder's e-mail that Ms. Gulledge had said nothing to him about the repaving of the parking lot.

(2) Later that same day (November 29), Ms. Gulledge responded to Mr. Holder, acknowledging that defendant indeed had paid a full month's rental for November. She went on to discuss a shortage in the rental payment for July 2003, as well as unpaid CAM expenses for 2003. Significantly, Ms. Gulledge referred to "other work, repairs, and maintenance that has been completed during the year 2005" which should be categorized as CAM expenses, and which would be billed to defendant during the first part of 2006 with supporting invoices and receipts. Once again, why Ms. Gulledge did not specifically mention

---

[6]Ex. 6.

11

the *extraordinary* CAM expense of repaving the lot defies logical explanation, bearing in mind that previous yearly CAM expenses amounted to a few thousand dollars, whereas this single CAM expense for the repaving was $89,012.00, equivalent to more than five months of rent payments.

(3) On December 12, 2005, Octavia Andrews, on behalf of defendant, e-mailed Mr. Kevin Gulledge[7] with reference to Ms. Gulledge's assertion that defendant had failed to make certain payments in 2003. According to Ms. Andrews, plaintiff had records showing that there was in fact no shortage in 2003.[8]

(4) On January 3, 2006, Ms. Gulledge e-mailed Mr. Holder regarding the bids to repair the leased area: $5,971.33 to remove the partition wall and $1,500.00 to level the concrete floor in the freezer area.

Again, Ms. Gulledge said nothing about the parking lot or its repaving.

(5) On January 3, 2006, Mr. Holder sent an e-mail to Ms. Gulledge in which he acknowledged on behalf of the defendant that the bids she procured for removal of the wall and leveling the floor were satisfactory, and the work should be allowed to proceed. He then wrote:

> We do not owe any back payments for CAM, Insurance, or Rent. We paid the November 2005 rent in full, but only owe the prorated amount. Prorated share due back to Bi-Lo: $8,421.28.
> Instead of receiving the prorated rental payment, we will apply that to the bid amount (i.e., for removal of the wall and leveling of the

---

[7]Kevin Gulledge is Keith Gulledge's son, and husband of Deborah Gulledge.

[8]A position with which plaintiff apparently did not disagree.

floor) and agree all payment obligations of both parties to be cleared. Please let me know if you will agree to this proposal.

(6) On January 20, 2006, plaintiff finally sent an invoice to defendant for its share of the repaving costs; that invoice was received by defendant on January 23, 2006. This was defendant's first inkling of the CAM expense.

(7) On January 28, 2006, Ms. Gulledge e-mailed the following response to Mr. Holder: "That is agreeable."

> An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement.
>
> ***
>
> To a valid accord and satisfaction it is also essential that what is given or agreed to be performed shall be offered as a satisfaction and extension of the original demand; *that the debtor shall intend it as a satisfaction of such obligation, and that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance of satisfaction are essential elements, in that they be lacking there can be no accord and satisfaction.* The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction. (Emphasis supplied.)

*Lytle v. Clopton*, 261 S.W. 664 (Tenn. 1924).

> Once the existence of a contract has been proven, the defendant in breach who asserts the defense of accord and satisfaction bears the burden of proof by a preponderance of the evidence that the contracting plaintiff *agreed* to accept lesser payment rendered in satisfaction of the original performance or payment for which the parties contract.

*Ward v. Wilkinson*, 1999 WL 221843 (Tenn. App. 1999).

Defendant insists that the last two e-mails between Mr. Holder and Ms. Gulledge constitute an accord and satisfaction. In Mr. Holder's e-mail to Ms. Gulledge, Mr. Holder proposes that plaintiff's obligation to defendant for the latter's overpayment of rent, and defendant's obligation for the repair work in the leased premises, cancel each other out. Of course, in Ms. Gulledge's reply she agreed to that proposal without saying anything about the huge unpaid CAM expense for the repaving. Respectfully, this is more akin to an estoppel; certainly it is not an accord and satisfaction. Defendant has failed to prove that plaintiff (particularly Ms. Gulledge) intended to accept a set-off of the claims referenced in these e-mails as a satisfaction of the $89,000.00 claim. Similarly, defendant failed to prove that *it* intended that the set-off was to satisfy the $89,000 CAM expense. How could Holder have such an intent when he did know of the $89,000 CAM expense? There was no accord and satisfaction.

For the reasons discussed above, the court concludes that the defendant is obligated for its pro rata share of the repaving costs. However, it would be unfair to enforce the agreement between Mr. Holder and Ms. Gulledge as set forth in their e-mails of January 3, 2006, and January 26, 2006. Plaintiff owed defendant $8,421.18 for overpayment of rent, and defendant owed plaintiff $7,471.33 for the removal of the wall and the leveling of the floor. Thus, plaintiff owed a net amount to defendant of $949.85. When Mr. Holder forgave that amount, he was blissfully unaware of the $89,012.00 claim for 2005 CAM expenses. As a result, $949.85 should be deducted from $89,012.00. The base amount of the judgment to be entered against defendant will be $88,062.15.

The matter of prejudgment interest is now addressed. Under ¶ 27 of the lease, it was contemplated that invoices and receipts for CAM expenses would be presented to the tenants at the end of the year, and that the tenant would pay those expenses in twelve monthly installments in the succeeding year. Plaintiff had an invoice or receipt from Hale Paving Company as early as November 11, 2005, yet it chose not to reveal that invoice to defendant until January 20, 2006. Under that circumstance, defendant's responsibility for payment would not commence until January 2007, and even then it had the right to make twelve payments of $7,338.51 each. Calculating interest on the basis of each month's failure to make such payments, commencing January 2007, possibly would require more skill than the Clerk's office possesses, and certainly more than this magistrate judge possesses. For the reasons discussed in the next paragraph regarding attorneys' fees, interest on the award of $88,062.15 shall be calculated from January 1, 2008.

Paragraph 35 of the lease agreement provides for payment of attorneys' fees in the event either party is required to hire an attorney as a result of the other party's breach. Since the court has held that the defendant is in breach because it failed to pay its pro rata share of the repaving expenses, normally paragraph 37 of the lease would require defendant to reimburse plaintiff for its attorneys' fees. However, based on equitable considerations, the court declines to do so. As referenced in an earlier part of this opinion, plaintiff's incredible failure to disclose the repaving, notwithstanding plaintiff had several opportunities to logically do so, all but guaranteed this litigation. To put it bluntly, plaintiff's machinations reasonably suggested to the defendant that it was being defrauded, and it understandably

resisted. There will be no award of attorneys' fees.

In conclusion, the Clerk will enter judgment in favor of the plaintiff and against the defendants in the amount of $88,062.15, plus interest on that amount calculated from January 1, 2008.

E N T E R :

s/ Dennis H. Inman  
United States Magistrate Judge